```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                        CASE NO. 22-CR-20114-KMW
 3
      UNITED STATES OF AMERICA,
 4                                      Miami, Florida
                 Plaintiff(s),
 5                                      April 1, 2022
                   vs.
 6
      CARLOS RAMON POLIT FAGGIONI,
 7
                 Defendant(s).      Pages 1 - 28
 8    ------------------------------------------------------------

 9                        DETENTION HEARING
                  TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10                BEFORE THE HONORABLE JACQUELINE BECERRA
                     UNITED STATES MAGISTRATE JUDGE
11
      APPEARANCES:
12
      FOR THE PLAINTIFF(S):    JILL SIMON, ESQ.
13                             UNITED STATES DEPARTMENT OF JUSTICE
                               1400 New York Avenue, NW
14                             Washington, D.C. 20005
                               202-262-7086
15                             jill.simon@usdoj.gov

16

17    FOR THE DEFENDANT(S):    FERNANDO L. TAMAYO, ESQ.
                               JAMES A. ODELL, ESQ.
18                             COFFEY BURLINGTON
                               2601 South Bayshore Drive
19                             Miami, FL 33133
                               306-858-2900
20                             ftamayo@coffeyburlington.com
                               jodell@coffeyburlington.com
21

22

23    TRANSCRIBED BY:          Joanne Mancari, RPR, CRR, CSR
                               Court Reporter
24                             jemancari@gmail.com

25
```

 1   Thereupon,

 2   the following proceedings were held:

 3          THE DEPUTY CLERK:  United States v. Carlos Ramon Polit

 4   Faggioni, 22 CR 20114, Williams.

 5          Will counsel state their appearances.

 6          MS. SIMON:  Good morning, your Honor.  Jill Simon on

 7   behalf of the United States.

 8          MR. TAMAYO:  Good morning, your Honor.  Fernando

 9   Tamayo and James Odell on behalf of Mr. Polit.

10          THE COURT:  All right.  We are here today for a

11   detention hearing.

12          Government.

13          MS. SIMON:  Your Honor, actually, the parties have

14   agreed to a bond.  For your Honor's consideration, we would set

15   out the proposal.

16          THE COURT:  Let me hear it.

17          MS. SIMON:  It is a 10 percent bond of a million

18   dollars to be deposited with the court, a personal surety bond

19   of 10 million, cosigned by the defendant, his son Charles

20   Polit, his son John Polit, his daughter Jeanette Polit, and his

21   wife Nancy Polit.  The personal surety bond would be secured by

22   the following properties in the Southern District of Florida,

23   which could not be sold or encumbered.  It is the three

24   properties listed in the indictment:  1900 Southwest 22nd

25   Street in Miami, 1010-1030 Northwest 9th Court in Miami, 301

1   Altara Avenue, unit 702, in Coral Gables, and then four

2   additional properties:  90 Southwest Third Street, unit 503,

3   1820 Southwest Third Avenue, 1830 Southwest Third Avenue, and

4   88 Southwest 7th Street, unit 1202.  Additionally, the bond

5   includes home confinement with electronic monitoring and

6   allowances for legal, medical, and religious visits.

7        THE COURT:  Let me ask you a question.  When you said

8   10 percent, so the deposit is 100,000.

9        MS. SIMON:  Yes.

10       THE COURT:  I don't see how that bond is sufficient.

11  You can correct me if I'm wrong.  I'm reading the indictment.

12  The defendant before me is involved in an $8 million fraud,

13  right.  He was a government official in Ecuador, right, when he

14  was demanding bribes.  So this wasn't, for example, a

15  businessman who was paying bribes to a government official,

16  right, and the government contends that that netted that

17  company a $50 million contract.  The individual who

18  participated in the bribes may never have seen that, right.

19       This is a totally different fact scenario where the

20  person is a government official.  His role as a government

21  official was to combat and address corruption.  He took $8

22  million, pursuant to the -- at least what the indictment is

23  suggesting, some of it in cash, made statements that he can

24  make cash disappear, is using Panamanian banks, and then when

25  he gets here to Pretrial Services he says he doesn't have a

1   dollar to his name.  His net worth is $147.

2        So I'm looking at a bond that is basically $100,000.

3   Three of the properties are part of the properties that are

4   going to be forfeited, right.  I don't know what the value of

5   the other properties is.  So I'm a little at a loss as to why

6   that would be sufficient.

7        He has multiple children in the United States, who I

8   assume own homes.  I don't know where those properties are.

9   And again, he is part of an $8 million fraud.  So basically I'm

10  looking at $100,000, is what we've got, three properties, that

11  the government is going to get in a forfeiture proceeding if

12  that goes forward, and then the other properties I don't have a

13  value of.  That is not sufficient.  So unless the parties are

14  going to tell me that I have to accept a stipulated bond, and I

15  don't believe I do, but if I'm wrong, I'm wrong.  You let me

16  know.  If I have to accept it, then I guess I have to accept

17  it.  But if I have to approve this bond, I don't see why this

18  bond is sufficient.

19        I will hear from the government and then I will hear

20  from you.

21        MS. SIMON:  Your Honor, if I could, on the value of

22  the properties, we believe looking at all of them based on

23  purchase price and when they were purchased is that they are

24  all worth around $10 million, and because the purpose of the

25  scheme here was in fact to launder $10 million, the government

1    believed that it was reasonable, that it is reasonable for the

2    properties securing the surety bond, the personal surety bond

3    equaling around $10 million is sufficiently reasonable given

4    the facts here.

5         THE COURT:  Why not a corporate surety bond?  I mean,

6    the personal surety bond isn't going to do much at all if he

7    decides to flee, which clearly given that he's taking cash, he

8    shows no assets to Pretrial Services, and he is using

9    third-party banks to launder the funds, again, I don't see why

10   a personal surety bond would be sufficient.

11        MS. SIMON:  Your Honor, we view these properties that

12   I listed as more valuable than the corporate surety bond.

13        THE COURT:  How can that possibly be?  When you have a

14   corporate surety bond, you are going to have a bondsman come in

15   and say if he flees tomorrow the government is going to have --

16   not the government, the court is going to have the property in

17   hand, as opposed to a personal surety bond which is basically a

18   promise not to encumber these properties.  I don't even know

19   who owns these properties based on this bond.  So I might have

20   a son and a daughter saying we won't pledge that property.

21   Maybe that property isn't totally in their interest.  Maybe

22   that property is held by an LLC.  It doesn't mean anything to

23   me with the bond package I have.

24        Let me hear from you, Mr. Tamayo.

25        MR. TAMAYO:  Thank you.  Your Honor, if I may, just to

1   clarify something.  Mr. Polit is a United States citizen.  He

2   has been here since 2016, and obviously he was aware of the

3   Ecuadorian proceedings against him.  He hasn't fled the United

4   States.

5            THE COURT:  Well, he can't leave the United States

6   because he has Ecuadorian proceedings against him, right.

7            MR. TAMAYO:  Well, no.

8            THE COURT:  I think that is a good reason why he

9   hasn't left the country.

10            MR. TAMAYO:  I mean, he had no restrictions to leave

11   the United States.  He has a U.S. passport and an Italian

12   passport.

13            THE COURT:  Is he wanted in Ecuador?

14            MR. TAMAYO:  He is wanted in Ecuador.

15            THE COURT:  Do you have reason to believe that if he

16   left this country and went to, let's say, Panama that perhaps

17   the Ecuadorian country -- the Panamanians would return him to

18   Ecuador?

19            MR. TAMAYO:  Depending on where he goes, of course, it

20   is always a possibility.

21            THE COURT:  Right.

22            MR. TAMAYO:  Your Honor --

23            THE COURT:  That is why you don't travel when you are

24   a fugitive from another country.

25            MR. TAMAYO:  Right.

```
 1              Your Honor, regarding the bond, we worked this out
 2     over the course of three days of sort of significant
 3     communications, evaluating the properties that are securing the
 4     personal surety bond.  They are family properties.  When
 5     Mr. Polit, I believe, on his form filled out his net worth,
 6     that was reflecting sort of what's under his name.
 7              THE COURT:  Which is exactly my point.
 8              MR. TAMAYO:  Right.
 9              THE COURT:  So I don't know what is under the name of
10     the people who are signing the personal surety bond.  That is
11     exactly my point.
12              MR. TAMAYO:  Right.  OK.  What would satisfy your
13     Honor as far as -- I mean, you mentioned a corporate surety
14     bond.  We can sidebar or speak with the government and try to
15     come up with something that's --
16              THE COURT:  I am not going to accept properties where
17     I have no idea who owns the properties given the scheme.
18              MR. TAMAYO:  Right.
19              THE COURT:  I'll tell you, this is not the
20     run-of-the-mill FCPA case.  It is just not.  This is a
21     sophisticated money laundering operation where he is using both
22     cash, right, which is troubling to the court because, of
23     course, cash is cash.  I don't know where that cash is, and it
24     is not an insignificant amount of money.  He also was using
25     Panamanian companies, right.  I don't think I need to go into
```

1    any further elaboration in the record as to what that may mean.

2         The indictment also alleges that he was using

3    properties to launder funds, right.  Three of them that you're

4    trying to pledge the government has already tied up.  The

5    others, I don't know where the valuation for those properties

6    has come and, more importantly, I don't know who owns them.  I

7    have been down this road on other cases before and then all of

8    the sudden it turns out that, sure, the people who sign the

9    personal surety bond didn't have an interest in the property or

10   maybe they had a partial interest in the property.  I don't

11   know anything about these properties.

12        When you have a corporate surety bond, at the very

13   least you have a bondsman that is evaluating those properties

14   and somebody is pledging them in a real way to a bondsman.

15        MR. TAMAYO:  Right.

16        THE COURT:  Now, it doesn't have to be a bondsman, I

17   suppose, but I am not even hearing who owns these properties

18   other than they are, quote-unquote, family properties.  By the

19   way, not all his children are signing the personal surety bond,

20   right, which also concerns me.  They are adult children, so

21   they could be married, which would be another issue with

22   respect to the family properties.

23        I can't tell you what will or will not satisfy me.  I

24   can tell you this certainly doesn't satisfy me.

25        MR. TAMAYO:  I will say, if I may, in regards to the

1    properties, I do believe the government, if I am correct, is

2    satisfied as to their knowledge of the ownership of the

3    properties, which is why they agreed to a bond package such as

4    this where they secure the bond.

5         THE COURT:  I know, but I don't sit here and just --

6    I'm sure Ms. Simon is highly competent.  I don't have any

7    reason to think that the government lawyers aren't highly

8    competent, but I also don't have to take their word for it when

9    I have nothing.

10        MR. TAMAYO:  May we have 15 minutes to discuss?

11        THE COURT:  You might need more, but that is OK.  I

12   will call the other case and then I will call you back.

13        MR. TAMAYO:  Thank you, your Honor.

14        MS. SIMON:  Thank you, your Honor.

15        (Recess)

16        THE DEPUTY CLERK:  Back in session.

17        THE COURT:  You may be seated.  We are recalling the

18   Carlos Ramon Polit Faggioni case, 22 CR 20114, Williams.

19        Counsel.

20        MS. SIMON:  Thank you, your Honor.  Jill Simon on

21   behalf of the United States.

22        MR. TAMAYO:  Fernando Tamayo and James Odell on behalf

23   of Mr. Polit.

24        THE COURT:  All right.  Where are we now?

25        MS. SIMON:  So thank you, your Honor.  We have had

1    some additional discussions and we have a revised proposal that

2    the parties have agreed to.

3           So this would be to convert the 10 percent bond to a

4    $1 million corporate surety bond.  We have an additional

5    cosigner for the personal surety bond, which is the defendant's

6    daughter Carla Polit.  She does live in Ecuador, but she is

7    here today and willing to sign.  The defendant's other child,

8    Michael Polit, lives in Ecuador and is not here today.  So all

9    of the family members here are signing, are willing to sign the

10   personal surety bond.

11          We have additional information for your Honor about

12   the properties.  So one of the properties is owned by the son

13   Charles Polit, who is a cosigner of the personal surety bond.

14   The other six are owned by LLCs.  Those LLCs are all wholly

15   owned by John Polit, who is the defendant's son and a cosigner

16   of the personal surety bond.  We understand from the appraisers

17   that these properties are valued at over 13 million.  The

18   approximately $10 million figure I gave your Honor earlier was

19   based on the purchase price of the properties, and they were

20   purchased some time ago.

21          John Polit is here today and the government would

22   require him to sign an affidavit stating that he is in fact the

23   owner of the LLCs, and we understand that he is not currently

24   listed as the manager of the LLCs but that he would change that

25   and would be listed as the manager of the LLCs by the end of

1    the day today.

2          THE COURT:  Have you seen any of this paperwork, any

3    of this documentation, counsel?

4          MS. SIMON:  So, your Honor, we have seen evidence that

5    the LLCs are in fact owned and controlled by John Polit.

6          THE COURT:  So why is the corporate surety bond only a

7    million if you think the properties are 10?

8          MR. TAMAYO:  I'm sorry, your Honor.  The personal

9    surety bond would remain as well, in addition to the corporate

10   surety bond, in the amount of $10 million.

11         THE COURT:  Right.  The personal surety bond is

12   useless if when the government tries to execute on them

13   Mr. Polit is no longer manager of the LLC or if there is some

14   other issue with the interest in his LLC.

15         I am interested in the corporate surety bond, which is

16   the million dollar bond, because there you are going to have a

17   bond -- and by the way, there will have to be a Nebbia

18   provision.  I don't see how in this kind of case you don't have

19   a Nebbia provision.  But if you have a million dollar corporate

20   surety bond, I don't understand if you think you have $10

21   million worth of clean property why it is not a $10 million

22   corporate surety bond.

23         MS. SIMON:  Well, the issue with that, your Honor -- I

24   mean, we do see the value in the properties, and with the

25   corporate surety bond, of course, there is the loss that the

1   defendant has.  So we are just trying to strike the right

2   balance.

3        MR. TAMAYO:  Your Honor, maybe this is a

4   misunderstanding, but if the properties that have been listed

5   and are being represented to the court as being owned by John

6   Polit, which he will sign in an affidavit, if they are attached

7   to the personal surety bond, if something were to happen with

8   Mr. Polit's appearance in front of this court, would the

9   government not be able to immediately take those properties in

10   satisfaction of the bond amount of $10 million?

11        THE COURT:  Right.  That is assuming that Mr. Polit's

12   representations to the court are accurate.  If the son's

13   representations aren't accurate, we have got nothing.

14        MR. TAMAYO:  I mean, is there any universe of

15   documentation we could provide to the court that --

16        THE COURT:  One, I have none, and the government

17   hasn't seen any.

18        Look, I don't know what is going on here with this

19   bond or why you all thought that that would be sufficient given

20   the factual pattern in this case.  Just given what is in the

21   indictment, I am reading what is in the indictment, what the

22   government has alleged in the indictment.

23        So I will set a bond.  It is not going to be this

24   bond.  It is just not.  You can continue to work on this bond,

25   but I want a corporate surety bond with a Nebbia.  And if

1   you're telling me that these properties are now worth $13

2   million, then why wouldn't I say I want all those properties on

3   a corporate surety bond with a Nebbia?  I mean, how were these

4   properties even purchased, right?  If they are properties that

5   are purchased with the proceeds, which is something that the

6   government alleges, at least to three of the properties you

7   represented before, why would these properties matter at all?

8   Because you would be happy to give up the properties if you

9   didn't really pay for them with your hard-earned money, right?

10          MR. TAMAYO:  Your Honor, Mr. Omar Otega, who has

11   represented the LLCs in issues, is in court.  May he address

12   the court on the ownership status of the properties?

13          THE COURT:  He can.  It is not going to sway me at

14   this point because that is not what I am looking for, but you

15   can go ahead.

16          MR. ORTEGA:  I believe I understand what the court's

17   concern is, and I have been representing Mr. Polit, John, and

18   JC Funds, which is one of the main companies that is addressed

19   here.

20          Judge, if the court's concern is guaranteeing the

21   appearance of this person and an amount sufficient to ensure

22   that, in fact, the amount that is being pledged would be $14

23   million, which is in excess of the $10 million the government

24   is asking for.  In order to prove and establish for this

25   court -- I'm happy to give it to the government -- we would

1    need to establish the operating agreements with the LLCs.  I'm

2    happy to provide those all to them.  We would be happy to

3    provide whatever guarantees that those properties aren't going

4    to be sold.

5              THE COURT:  Then there is the Nebbia.  How were these

6    properties purchased.

7              THE DEPUTY CLERK:  Counsel, you need to slow down for

8    the interpreter.

9              MR. ORTEGA:  My apologies.

10             THE INTERPRETER:  For everybody, please.  For

11   everybody.  Thank you.

12             MR. ORTEGA:  The issue, it is not so much with the

13   Nebbia requirement, your Honor, and I'm happy to address how it

14   was that each of those properties were purchased, because this

15   is not something -- obviously the government has their

16   allegations, and we are not here to argue the basis of their

17   allegations.  We have evidence sufficient to establish how they

18   were purchased, when they were purchased, the money that was

19   used for those purchases.  I have been doing this with this

20   client for quite a while.

21             THE COURT:  Is that something the government has seen?

22             MR. ORTEGA:  The government hasn't asked.  Obviously

23   the government, they are charging however they thought was

24   appropriate, and that's fine.  That is an issue for a different

25   day.

1    For purposes of establishing, however, if you are

2    asking for a corporate surety bond, what ends up happening with

3    that, and you are asking for a corporate surety bond of 10

4    million, then the actual out-of-pocket expense of coming up

5    with that would require probably losing some of the properties

6    to be able to satisfy that because we would have to pay for the

7    amount that is necessary for that deposit.

8    THE COURT:  Right.  What are you going to have to pay

9    a bondsman for 13 million?

10   MR. ORTEGA:  He would have to pay 15 percent of that.

11   So you're looking at north of 1.5 for just 10 million, and that

12   isn't necessarily the purpose of the bond.  The bond is to

13   ensure the appearance of the client.  If we are giving up those

14   properties, and people who aren't even part of this are giving

15   up their property and pledging it, we would ask the court to

16   consider that to be sufficient.

17   THE COURT:  I assume you have read the indictment.

18   MR. ORTEGA:  I have read the indictment.  I am well

19   aware of the facts.

20   THE COURT:  Right.  The problem is that the indictment

21   alleges, right, that the money was laundered in large part

22   through properties in this community.  I'm back to square -- I

23   mean --

24   MR. ORTEGA:  It is a valid point, but I would say to

25   your Honor, and I know counsel -- I am not here as counsel for

```
 1   this client.  I obviously represent his son and the companies.
 2   If the issue is ensuring that this community does not have a
 3   loss if this gentleman decides to skip bail, that is being --
 4            THE COURT:  No, no.  There's two things.  First I have
 5   to assure me that he will reappear, of course.  So if what he
 6   is using to assure me that he will reappear are properties
 7   that, for example, were purchased with bribe money, then that
 8   doesn't assure me at all.
 9            MR. ORTEGA:  Understood.
10            THE COURT:  That is the problem.  I have not heard the
11   word Nebbia said once by any counsel.
12            MR. ORTEGA:  Judge, if I may, first, I am not
13   pledging -- yes, some of those properties that are there are
14   the ones that they have alleged, but the majority --
15            THE COURT:  So those properties don't mean anything to
16   me with respect to getting him to reappear.
17            MR. ORTEGA:  Understood, but the remainder of the
18   properties exceed even the $8 million number that they have put
19   on.
20            THE COURT:  Sir, I don't have any reason to think that
21   what you are telling me is untrue.
22            MR. ORTEGA:  Understood.
23            THE COURT:  I don't know you, but I take your word for
24   it.  I assume you are a member of the bar, so I take your word
25   for it.  But I am not in the business of just taking your word
```

1    for it not because again I think you would give me a

2    misrepresentation, because I have zero reason to think that and

3    that is not what I am suggesting, but your information is only

4    as good as the information people give you.  So unless I have

5    those people on the hook in some significant way --

6           MR. ORTEGA:  And you will and you have, but I am happy

7    to give that information to the government to ensure that when

8    they sit here and make those representations, whether it is the

9    operator agreements to the LLCs, whether it is documents

10   reflecting the purchases, whether it is documents reflecting

11   that it can't be encumbered, all those things I am happy to

12   give to the court and to the prosecution to ensure what the

13   court is concerned about.

14          THE COURT:  All right.  Does the government have

15   anything else?

16          MS. SIMON:  Your Honor, just that I wanted to make

17   sure that the additional four properties that we have been

18   talking about that are not listed in the indictment, I mean, we

19   think of those essentially as substitute assets.  That is why

20   they are not in the indictment in the forfeiture section, just

21   to be clear on that point.

22          THE COURT:  No, correct.  You may not sitting here

23   have any information to suggest that they could be substitute

24   properties, but given the representation that the defense just

25   made, that the proceeds to purchase that property are not

1    proceeds that you have had any opportunity to review, right,

2    that doesn't give me a lot of comfort, especially since the

3    indictment also alleges that he used, I think it said family

4    members, right, who participated in this.  So I am not

5    suggesting that Mr. John Polit had anything to do with any of

6    this, but it is an individual who you have indicted on

7    allegations that he was willing to use family members to

8    further a criminal conspiracy.

9         I mean, it is just a difficult fact pattern as

10   indicted.  I mean, I have to look at the indictment, right, as

11   returned by the grand jury and I have to give some weight to

12   what those allegations are.  So if there were no allegations of

13   using family members, if there were no allegations of

14   Panamanian money, if there were no allegations of cash, if

15   there were no allegations of using South Florida properties, we

16   might have a totally different discussion.

17        MR. TAMAYO:  Your Honor, I'm just looking at the

18   holistic package that was presented.  I just view the home

19   detention, the corporate surety bond in the amount we

20   offered --

21        THE COURT:  No, you didn't have a corporate surety.

22   You have a corporate surety bond now.

23        MR. TAMAYO:  Yes, now.  That is what I mean, now,

24   right.  Our newest or second proposal.

25        THE COURT:  Without a Nebbia.  Without a Nebbia.

```
 1            MR. TAMAYO:  With a Nebbia

 2            THE COURT:  You're adding a Nebbia, because you didn't

 3   have a Nebbia before.

 4            MR. TAMAYO:  There is no reason not to.  I know your

 5   Honor is going to require it.  It will be added.

 6            THE COURT:  This is how I feel about home detention.

 7   Obviously the basis for any kind of detention or the concern

 8   for this defendant is risk of flight, right.  This is not an

 9   argument on safety of the community, right.  There are plenty

10   of folks sitting right next door that are sitting next door

11   because they presented a risk of flight.  If GPS monitoring

12   were enough, then we would never detain people for risk of

13   flight because we would just put them on a monitor, and clearly

14   we don't do that.

15            MS. SIMON:  Your Honor, if I may.  I think the

16   government stated earlier this week at the initial that it was

17   our initial intention to seek detention here, but there is a

18   critical fact as viewed by us that when the defendant found out

19   that agents were seeking his arrest, he did immediately

20   self-surrender.  So that gave the government some comfort that

21   there was in fact a bond that was sufficient here.

22            THE COURT:  I'm sorry.  The only comfort I see in any

23   of this fact pattern is that if he tried to leave, he runs the

24   risk of ending up in Ecuador, which is probably the last place

25   he wants to be.
```

```
 1              MR. TAMAYO:  Correct.

 2              THE COURT:  I mean, nobody has argued that, quite

 3    frankly.  That to me is --

 4              MR. TAMAYO:  And the other thing is --

 5              THE COURT:  -- more the reason he hasn't left here.

 6              Excuse me, sir.  Let me finish.

 7              MR. TAMAYO:  Oh, I'm sorry.  I apologize.

 8              THE COURT:  One, you shouldn't interrupt me.

 9              MR. TAMAYO:  I'm sorry.

10              THE COURT:  And two, we have an interpreter who is

11    already frustrated enough at how fast everybody is talking.

12              So I understand that that is an argument.  It is not

13    going to win the day for me, obviously, because it is very

14    different to now have federal proceedings in the United States

15    against you as it was to have Ecuadorian proceedings.

16              Let me ask the government one more question.  What are

17    the guidelines?

18              MS. SIMON:  The guidelines, as we calculate them, are

19    12 to 15 years.

20              THE COURT:  All right.  Look, you are no longer asking

21    for detention, right.  You are asking for a bond.

22              MS. SIMON:  Correct, your Honor.

23              THE COURT:  I don't find that the bond, the second

24    bond that is presented is adequate.

25              I am going to go into my chambers.  I am going to
```

1    think it through.  I am going to run some numbers, get a

2    calculator, and give you the bond that I think is the adequate

3    bond.  If you can meet it, great.  If you can't meet it, you

4    have two options then, right.  You can either ask me to

5    reconsider or you can appeal me to Judge Williams.  But I will

6    give you a bond so that you have got something to work with.

7    Like I said, either you can meet it or you can't, and if you

8    can't, you either come back to me with something that you think

9    I might live with or you go to Judge Williams.

10        MR. TAMAYO:  The only one thing I was trying to say,

11   your Honor, and I apologize for interrupting, was that his

12   family, other than his son who lives in Ecuador and his

13   daughter who is here right now that lives in Ecuador, and again

14   they are in Ecuador, everyone else lives here.  Those are

15   significant ties to the community.  The family is embedded in

16   the community.  I think that that holds some sway as to whether

17   this man would flee the country, with electronic monitoring,

18   his passport surrendered.  He's been here for six years, as I

19   know.  Point well-taken about where would he go, but he did not

20   have a red notice, an Interpol red notice that would have

21   prevented him from fleeing internationally to the EU, where he

22   was a citizen.  He's been here.  He stayed.  He surrendered, as

23   the government said, the day that he understood that they were

24   looking for him.

25        THE COURT:  I understand.

1          MR. TAMAYO:  I just wanted to point that out, your

2     Honor.

3          THE COURT:  But I've got a 72-year-old man who is

4     looking at a potential of a 12-year sentence.  One thing is to

5     say they might be looking for me in Ecuador so I will just stay

6     here in my luxury high-rise in Miami, right, and just not

7     leave.  Not a bad decision, right.  Now it is a different

8     decision because now he's looking at spending a significant

9     time in a federal detention facility.  So that completely

10    changes the calculus.

11         Like I said, the government isn't asking for

12    detention, so that is neither here nor there anymore.  I will

13    give you the bond that I think is the adequate bond and then

14    you guys know what your options are.

15         Give me a minute because I want to take a minute to

16    think about it.

17         MR. TAMAYO:  Thank you, your Honor.

18         MS. SIMON:  Thank you, your Honor.

19         (Recess)

20         THE COURT:  All right.  You may be seated.

21         This is recalling the Polit matter at 22 CR 20114,

22    Williams.

23         All right.  I appreciate everybody's patience while I

24    gave more thought as to what I was going to do.

25         So the bond I'm fashioning is as follows.  It is a

1   bond that the defendant can make.  I am not fashioning a bond

2   he can't make.  I think that is contrary to at least if not the

3   law the ends of justice.  So this is a bond he can make.  It is

4   not a bond he can make this afternoon because you're going to

5   have to do things to get the bond ready, but this is the bond.

6          So it will be an $8 million corporate surety bond with

7   a Nebbia.  There will be a $10 million personal surety bond to

8   be signed by the defendant, the wife, and any child who is not

9   otherwise pledging property on the Nebbia.  So since I don't

10   know who owns what, if all of the 8 million on the corporate

11   surety is pledged by one son, then the remainder of the

12   children have to sign the 10 million personal surety bond.

13          The three properties that are in the indictment that

14   are part of the forfeiture, there needs to be a lis pendens, a

15   lien, something filed on that before he is released.  That

16   property is otherwise encumbered by the forfeiture provisions,

17   unless of course he is acquitted, in which case it is neither

18   here nor there.  Maybe there are other forfeiture proceedings.

19   I don't know.  But the government has to file that.

20          So that leaves the other four properties.  The

21   government has represented that those are worth about 13

22   million now.  So that leaves ample money both to pledge the 8

23   on the corporate surety bond —— if they have to sell one to pay

24   the bondsman, it is what it is.  I want it with a Nebbia.  So

25   obviously the Nebbia assurance is the government's

1   responsibility, but the responsibility to assure the court that

2   those assets really belong to someone is going to belong to the

3   bondsman.

4        I understand you have to pay a bondsman, but given the

5   fact that twice what the parties represented didn't give me any

6   assurance that we really understood who owned these properties,

7   including the fact that the last representation was that the

8   son would sign an affidavit today.  So in the first bond that

9   you all proposed, those were properties that were owned by an

10  LLC, including whether or not we would have had any ability as

11  a court or as the government to pursue those bonds.  So given

12  that, I understand that you are going to have to pay for a

13  bondsman to do it, but we will just have to pay them for the

14  bondsman to do it.

15       The defendant will sign a waiver of extradition, and

16  then upon his release he will be on home confinement.  He will

17  have GPS monitoring.  You will have to tell the court who he is

18  going to live with.

19       Do you know where he is going to live if he is

20  released or when he is released?

21       MR. TAMAYO:  Yes, your Honor.  I have the address.  It

22  is on Brickell Key.  It is with his daughter, her husband, his

23  wife, and his daughter and his grandkids, his two grandkids.

24       THE COURT:  So that information will have to be given

25  over to Pretrial Services.  I will allow him to live with that

1  daughter.

2         His only allowances to leave that property will be to

3  court, to go visit his lawyer, obviously, for legal visits.  He

4  will report to Pretrial Services as directed.  So obviously he

5  will be allowed to leave to go to Pretrial Services, and he

6  will be allowed to leave for medical reasons.

7         He is to surrender all his passports.  I understand

8  from the Pretrial Services report that his passports have

9  already been given over to you, but he is to surrender any visa

10 cards, passport cards, and of course, he can't do anything to

11 get new passport or new travel documents.

12        There are to be no weapons in the home, and I think I

13 already said that he had to report to Pretrial Services as

14 directed.

15        Is there anything else on probation that I have missed

16 in terms of the standard conditions?

17        THE DEPUTY CLERK:  Judge, is that GPS or at the

18 discretion of --

19        THE COURT:  GPS.

20        THE DEPUTY CLERK:  Thank you.

21        MR. TAMAYO:  One thing on the passports, your Honor.

22 His Ecuadorian passport was surrendered, I believe, at the

23 Ecuadorian consulate in 2017.  He has a receipt that was given

24 to him that we will turn in as well.

25        THE COURT:  That is fine.

```
 1              MR. TAMAYO:  I mentioned it to the government.  The

 2    other two passports will also be surrendered.

 3              THE COURT:  By the way, I also want the wife's

 4    passport surrendered.

 5              MR. TAMAYO:  OK.

 6              THE COURT:  Anything else?

 7              PROBATION OFFICER:  Yes, your Honor.  On the four

 8    properties, just to make sure they are not to be encumbered.

 9              THE COURT:  So they are going to be -- those four

10    properties will be part of a corporate surety bond.  I mean, we

11    can add that they are not encumbered.  Actually, I don't know

12    what they are going to use to pledge the 8 million, so I am not

13    saying anything about the other four properties.  Maybe one

14    property is worth 8.  I have no idea.  It is a corporate surety

15    bond.

16              The bondsman will decide where he is getting his 8

17    million from with a Nebbia.  So we are not taking any issue

18    with the four.  The three that are part of the forfeiture, the

19    government is going to have to -- you will have to give a

20    package to the court that has these documentations, obviously,

21    otherwise, you are not going to get the release order.  So

22    there is really nothing specific as to the four.

23              PROBATION OFFICER:  And for the GPS, that will be paid

24    by the defendant?

25              THE DEPUTY CLERK:  We can't hear you.
```

```
 1              PROBATION OFFICER:  For the GPS, it will be paid by

 2    the defendant?

 3              THE COURT:  GPS to be paid by the defendant.

 4              PROBATION OFFICER:  Thank you, your Honor.

 5              THE COURT:  All right.  Government, anything else on

 6    the bond?

 7              MS. SIMON:  Nothing further, your Honor.

 8              MR. TAMAYO:  Nothing on the bond, your Honor.  I know

 9    this may not be your department, but there are three

10    medications I just wanted to point out that he requires for a

11    heart condition that he has, that he has not been able to get

12    inside of the jail.  We put in requests.  I don't know if there

13    is anything your Honor has power to do to request that he be

14    provided them.

15              THE COURT:  I don't.  Now, I will tell you what I have

16    done in other cases.  So sometimes it just takes a day or two

17    because you are going to have to get reviewed by somebody, a

18    medical doctor there.  Because you were coming so quickly to a

19    bond hearing, you may not sort of be in that loop.

20              I don't know how long it will be before you are

21    released.  I am sure your family and your lawyer will do

22    everything to get you released as soon as possible, but it is

23    going to take a while.  It would probably take a few days, I

24    would think.  You need your medication in the meantime.

25              So if by Monday you are not seeing any movement on the
```

1   medication, submit to my chambers a proposed order.  What I

2   typically do is do a show cause order as to why he is not

3   getting the medication that is required, and you will list what

4   the medication is.  That doesn't mean he will get it, right,

5   but it is one way of alerting FDC you have somebody there who

6   is not giving him the meds, why not.  That is all I can do.

7   Otherwise, there is not much I can do.

8           MR. TAMAYO:  I appreciate that, your Honor.  Thank

9   you.

10          THE COURT:  All right.  Then if you are going to

11  present a package to me, the sooner, obviously, the better.

12  You could file it, that's fine, or you could present it to

13  chambers.  Either way is fine.  I am here all week next week.

14  I suspect that I will see it at some point next week if not the

15  next.

16          All right.  Anything else?  There is nothing else.

17  Thank you very much.

18          MS. SIMON:  Thank you, your Honor.

19          MR. TAMAYO:  Thank you, Judge.

20          (Adjourned)

21

22

23

24

25

C E R T I F I C A T E


       I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


April 5, 2022              s/ Joanne Mancari
                           Joanne Mancari, RPR, CRR, CSR
                           Court Reporter
                           jemancari@gmail.com